AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

District of New Mexico ▼

FILED
UNITED STATES DISTRICT COURT
LAS CRUCES, NEW MEXICO

OCT 2 9 2024

MITCHELL R. ELFERS
CLERK OF COURT

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>3115 El Camino Real, Space 82, Las Cruces, New<br>Mexico 88007<br>(Subject Premises 2) | )<br>)<br>)<br>)<br>)<br>) | Case No. 24-2001 mr |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A, which is attached and fully incorporated.

located in the _____ District of _____New Mexico_____ , there is now concealed *(identify the person or describe the property to be seized):*

See attachment B, which is attached and fully incorporated herein.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841 and 846 | Possession with intent to distribute a controlled substance and conspiracy. |

The application is based on these facts:

See Attachment C, which is attached and fully incorporated herein.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Chandler Rule, DEA Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

- by telephone. JHR

Date: October 29, 2024

_____
*Judge's signature*

City and state: Las Cruces, New Mexico

Jerry H. Ritter, U.S. Magistrate Judge
*Printed name and title*

## ATTACHMENT A

*Property to be Searched*

### Subject Premises 1 – 5301 Bell Road, Las Cruces, NM 88021

The property to be searched is 5301 Bell Road, Las Cruces, New Mexico 88021, hereinafter "Subject Premises 1," further described as a gray trailer with a brown roof. A photograph of Subject Premises #1 appears below.



The search of Subject Premises 1 shall include the search of the entire residence, all attached and unattached garages, outbuildings, and storage areas/containers (including mailboxes and trash cans) on Subject Premises 1, all persons located on Subject Premises 1, and all vehicles located on Subject Premises 1 that are associated with Armando Gonzales, Elizabeth Gonzales, Beatriz Gonzalez, Daniel Herrera, Brock Beserra, Richard Beserra, Kenneth Yager, and Ruben Galindo, in or on which the items to be seized could be concealed.

<u>Subject Premises 2 - 3115 El Camino Real, Space 82, Las Cruces, New Mexico 88007</u>

The property to be searched is 3115 El Camino Real, Space 82, Las Cruces, New Mexico 88007, hereinafter "Subject Premises 2," further described as a blue mobile home with a shingled roof. A photograph of Subject Premises 2 appears below.



The search of Subject Premises 2 shall include the search of the entire residence, all attached and unattached garages, outbuildings, and storage areas/containers (including mailboxes and trash cans) on Subject Premises 2, all persons located on Subject Premises 2, and all vehicles located on Subject Premises 2 that are associated with Armando Gonzales, Elizabeth Gonzales, Beatriz Gonzalez, Daniel Herrera, Brock Beserra, Richard Beserra, Kenneth Yager, and Ruben Galindo, in or on which the items to be seized could be concealed.

Subject Premises 3 - 5266 Ralls Road, Las Cruces, New Mexico 88012

The property to be searched is 5266 Ralls Road, Las Cruces, New Mexico 88012, hereinafter "Subject Premises 3," further described as a double-wide mobile home with tan siding and a shingled roof. A photograph of Subject Premises 3 appears below.



The search of Subject Premises 3 shall include the search of the entire residence, all attached and unattached garages, outbuildings, and storage areas/containers (including mailboxes and trash cans) on Subject Premises 3, all persons located on Subject Premises 3, and all vehicles located on Subject Premises 3 that are associated with Armando Gonzales, Elizabeth Gonzales, Beatriz Gonzalez, Daniel Herrera, Brock Beserra, Richard Beserra, Kenneth Yager, and Ruben Galindo, in or on which the items to be seized could be concealed.

<u>Subject Premises 4 - 2826 Ox Cart Court, Las Cruces, New Mexico 88007</u>

The property to be searched is 2826 Ox Cart Court, Las Cruces, New Mexico 88007, hereinafter "Subject Premises 4," further described as a residence with gray stucco siding and a shingled roof.  A photograph of Subject Premises 4 appears below.



The search of Subject Premises 4 shall include the search of the entire residence, all attached and unattached garages, outbuildings, and storage areas/containers (including mailboxes and trash cans) on Subject Premises 4, all persons located on Subject Premises 4, and all vehicles located on Subject Premises 4 that are associated with Armando Gonzales, Elizabeth Gonzales, Beatriz Gonzalez, Daniel Herrera, Brock Beserra, Richard Beserra, Kenneth Yager, and Ruben Galindo, in or on which the items to be seized could be concealed.

<u>Subject Premises 5 - 1954 Lyon Place, Las Cruces, New Mexico 88001</u>

The property to be searched is 1954 Lyon Place, Las Cruces, New Mexico 88001, hereinafter "Subject Premises 5," further described as a residence with gray stucco siding and a shingled roof. A photograph of Subject Premises 5 appears below.



The search of Subject Premises 5 shall include the search of the entire residence, all attached and unattached garages, outbuildings, and storage areas/containers (including mailboxes and trash cans) on Subject Premises 5, all persons located on Subject Premises 3, and all vehicles located on Subject Premises 5 that are associated with Armando Gonzales, Elizabeth Gonzales, Beatriz Gonzalez, Daniel Herrera, Brock Beserra, Richard Beserra, Kenneth Yager, and Ruben Galindo, in or on which the items to be seized could be concealed.

**ATTACHMENT B**

*Property to be Seized*

All records, information, and evidence relating to violations of 21 U.S.C. § 841 and 846 involving Armando Gonzales, Elizabeth Gonzales, Beatriz Gonzalez, Daniel Herrera, Phillip Estell, Brock Beserra, Richard Beserra, Kenneth Yager, Ruben Galindo, and their co-conspirators, including:

1.  Any cellular telephones, SIM cards, digital tablets, personal digital assistant (PDA) devices or other communication devices and any and all information stored on such communication devices, including:

    a.  Phone numbers, names, usernames, email addresses, residential addresses, and other identifying information of customers, distributors, sources of supply, and other associates of the user of the communication devices;

    b.  Audio and video calls made to or from the communication devices, along with the duration and date and time each such communication occurred;

    c.  Any message logs or messages, whether sent from, to, or drafted on the communication devices, along with the date and time each such communication occurred;

    d.  The content of voice mail messages and audio and video messages stored on the communication devices, along with the date and time each such communication occurred;

    e.  Photographs or video recordings;

    f.  Information relating to the schedule, whereabouts, or travel of the user of the communication devices;

    g.  Information relating to other methods of communications, including the contents of those communications, utilized by the user of the communication devices and stored on the communication devices;

    h.  Bank records, checks, credit card bills, account information and other financial records; and

    i.  Evidence of user attribution showing who used or owned the communication devices, such as social media accounts, email addresses, messages, location information, photographs and videos, phonebooks, saved usernames and passwords, documents, and internet browsing history;

2.  Records relating to the importation, distribution, and possession of controlled substances, including, but not limited to books, records, receipts, cell phones, cell phone records, notes, ledgers, notebooks, border crossing documents, designated codes and other papers relating to the transportation, ordering, purchase and distribution of controlled substances;

3.  Papers, tickets, notes, schedules, receipts including bill of sales for vehicles, registration and licensing of vehicles, license plates, vehicle titles, registration, documents, stickers, and other proof of ownership and tax compliance, driver's license, or proof of insurance and liability;

4.  Financial documents, including but not limited to, credit card statements, tax returns, safe deposit records, safe deposit keys, bank records, bank statements, money orders, Western Union receipts, checking account records, cashier's checks, passbooks and other items evidencing the obtainment, concealment and/or expenditure of money or assets;

5.  Identification and personal records including address books, telephone directories, calendars, diaries, social security cards, lists of names, social security numbers and other personal identification, telephone and address books or papers of individuals involved in the trafficking of controlled substances;

6.  Photographs, video recordings, slides, digital files, DVDs, CD-Rs, or other media containing images or video of individuals involved in the trafficking of controlled substance which demonstrate his/her involvement in drug trafficking as well as other notes, records, diaries, journals, emails, blog entries, which demonstrate involvement in drug trafficking;

7.  Proceeds of an unlawful activity, including but not limited to, United States currency, jewelry, vehicles and other assets or financial records related thereto;

8.  Documents, books and papers reflecting names, addresses and/or telephone numbers and lists pertaining to individuals involved in the trafficking of controlled substances;

9.  Diaries, purchase records, cash receipts and disbursement journals, inventory records and other records relating to the operation of controlled substance sales, repackaging, and redistribution in violation of 21 U.S.C. 841 and 846;

10. United States currency, currency counting machines, precious metals, jewelry, financial instruments including stocks and bonds, and all other items of value, and all sales receipts for items of value, that evidence the proceeds from the smuggling, transporting or distribution of drugs.

11. Devices or objects utilized to account for proceeds related to violation of violation of 21 U.S.C. §§ 841 and 846, including but not limited to currency counting machines;

12. Controlled substances, drug paraphernalia, and packaging materials, including scales, plastic baggies, vacuum sealing machines, and tape;

13. Firearms and ammunition as defined by Title 18 USC Section 921, documents relating to the purchase or possession of firearms, and items related to firearms, such as holsters, magazines, and ammunition boxes;

14. Valid or false identification documents, including drivers' licenses, social security cards, state identification cards and foreign identification documents;

15. Bills, notes, contracts, or other documents reflecting the ownership, subscription information or use or control of one or more telephones, vehicles, or the location to be searched;

16. Surveillance systems, including digital video surveillance and any stored surveillance video;

17. Safes, lock boxes, or other locked containers, in which the items in paragraphs 1 through 16 could be concealed; and

18. Any and all computers, digital media, and storage media that reasonably appear to contain some or all of the records, information, and/or evidence described in paragraphs 1 through 16.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer, digital media, or storage media; any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "digital media" includes personal digital assistants (PDAs), smartphones, tablets, BlackBerry devices, iPhones, iPods, iPads, digital cameras, and cellular telephones.

The term "storage media" includes any physical object upon which electronic data can be recorded, such as hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media or digital medium.

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, smartphones, tablets, server computers, and network hardware.

This warrant authorizes a review of all electronic media seized pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The warrant also authorizes a review of all electronic media for evidence of who used, owned, or controlled the electronic media at the time the things described in this warrant were created, edited, or deleted. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, law enforcement may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

During the execution of the search of Subject Premises 1-5, described in Attachment A, law enforcement personnel are authorized to (1) press or swipe the fingers (including thumbs) of any individual who is found at the Subject Premises 1-5 and reasonably believed by law enforcement to be a user of a device found at the premises, to the fingerprint scanner of the device; (2) hold a device found at the premises in front of the face those same individuals and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.

**ATTACHMENT C - AFFIDAVIT IN SUPPORT
OF AN APPLICATION UNDER RULE 41 FOR
A WARRANT TO SEARCH AND SEIZE**

I, Chandler Rule, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.    I make this affidavit in support of an application under Rule 41 of the Federal Rules of

Criminal Procedure for warrants to search:

    a.  5301 Bell Road Las Cruces, New Mexico 88021 ("Subject Premises 1");

    b.  3115 El Camino Real, Space 82, Las Cruces, New Mexico 88007 ("Subject Premises 2");

    c.  5266 Ralls Road, Las Cruces, New Mexico 88012 ("Subject Premises 3");

    d.  2826 Ox Cart Court, Las Cruces, New Mexico 88007 ("Subject Premises 4"); and,

    e.  1954 Lyon Place, Las Cruces, New Mexico 88001 ("Subject Premises 5"),

collectively referenced as "the Subject Premises," further described in Attachment A, for the

things described in Attachment B.

2.    I am a Special Agent with the Drug Enforcement Administration (DEA) (the "Investigative

Agency") and have been since December 2021. As such, I am a law enforcement officer of the

United States within the meaning of 18 U.S.C. § 2510(7), and I am empowered by law to

conduct investigations and to make arrests for criminal offenses, to include those enumerated

in 18 U.S.C. § 2516. Prior to becoming a Special Agent with DEA, I was employed as a

Trooper with the Kansas Highway Patrol from 2016 to 2021. During my career as a law

enforcement officer and narcotics agent, I have conducted and assisted with numerous criminal

investigations concerning violations of the Controlled Substances Act, I and have received

ongoing training in conducting such investigations. Through my training, education, and

experience, I have become familiar with the manner in which drug trafficking organizations operate.

3.      My experience as a narcotics agent includes, but is not limited to: conducting physical surveillance, interviewing witnesses, writing affidavits for and executing search warrants, working with undercover agents and informants, issuance of administrative and federal grand jury subpoenas, analysis of phone toll and financial records, and analysis of data derived from the use of pen registers, trap and traces, and wiretaps.

4.      I have been involved in an ongoing investigation regarding the distribution of controlled substances in violation of 21 U.S.C. § 841 and 846, specifically methamphetamine and fentanyl, in and around Las Cruces, New Mexico. I, as well as other Special Agents and Task Force Officers with the DEA and Homeland Security Investigations (HSI), together with law enforcement officials from other agencies, have obtained information regarding the illegal drug trafficking activities of Armando Gonzales ("Gonzales"), Beatrice Gonzalez ("B. Gonzalez"), Ernesto Flores ("Flores"), Daniel Herrera ("Herrera"), Antonio Valles ("Valles"), Sylvia Parra ("Parra"), Richard Beserra ("Beserra"), Brock Beserra ("Brock"), Kenneth Yeager ("Yeager"), and others (the "Subjects").

5.      I make this affidavit based upon my own personal knowledge, which is substantially derived from my participation in the investigation, as well as that of fellow agents and officers who have participated in the investigation.  In addition, I have developed information I believe to be reliable from additional sources including:

      a.  Information provided by Task Force Officers ("TFO"), Special Agents ("SA"), and Intelligence Research Specialists (IRS) of the DEA and HSI, and other law

enforcement officials ("agents"), including oral and written reports that I have received directly or indirectly from said investigators;

b.  Wiretap intercepts and other lawfully obtained recorded conversations;

c.  Results of physical surveillance conducted by agents during the investigation;

d.  A review of telephone toll records and subscriber information;

e.  Information derived from consensually recorded conversations;

f.  A review of driver's license and automobile registration records; and

g.  Records from commercial databases.

6.  This affidavit is intended to show only that there is sufficient probable cause for the requested warrants and does not set forth all of my knowledge about this matter.

## FEDERAL CHARGES RELEVANT TO THIS INVESTIGATION

7.  I believe there is probable cause that the Subjects have committed, are committing, and will continue to commit offenses involving violations of 21 U.S.C. § 841 and 846 – Conspiracy to distribute and possession with intent to distribute controlled substances.

## EVIDENCE SOUGHT DURING SEARCH

8.  Based on my training, experience and participation in this and in similar investigations, I know that:

a.  individuals involved in illegal trafficking of controlled substances often conceal evidence of their drug trafficking activities in their residences and businesses, or the residences of friends or relatives, and in surrounding areas to which they have ready access such as garages, carports and outbuildings. They also conceal evidence in vehicles, including vehicles outside of their residences and businesses, so that they have ready access to it

and so that they can hide it from law enforcement, including law enforcement officers executing search warrants at their residences or businesses. Evidence also may be found in other areas to which a drug dealer has ready access, such as rented storage areas and safety deposit boxes, or buried underground on their property. This evidence, which is discussed in detail in the following paragraphs, includes controlled substances, paraphernalia for weighing, packaging and distributing controlled substances, other contraband, records, documents, as well as evidence of drug transactions, proceeds from drug sales, and valuables obtained from proceeds.

b.  Individuals involved in illegal drug trafficking of controlled substances often keep quantities of controlled substances on their person, in their residences, garages, outbuildings, storage areas, carports and yards, in their businesses, in the residences of friends or relatives, in their vehicles, in off-site storage facilities, and in other areas to which they have ready access.

c.  Individuals involved in drug dealing commonly use certain paraphernalia to package and prepare controlled substances for distribution. The paraphernalia includes, but is not limited to, packaging materials (such as plastic baggies, wrapping paper, cellophane, condoms, and film canisters) and scales to weigh controlled substances. Drug dealers commonly store these items on their person, in their residences, in their businesses, in their residences of friends or relatives, in their vehicles, and in other areas to which they have ready access.

d.  Drug traffickers often maintain records of their transactions in a manner similar to the record keeping procedures of legitimate businesses. Even after the drugs are sold, documentary records are often maintained for long periods of time, even years, to

memorialize past transactions, the status of accounts receivable and accounts payable, and the names and telephone numbers of suppliers, customers and co-conspirators. These records may be maintained on paper, in the form of business and personal ledgers and diaries, calendars, memoranda, pay/owe sheets, IOUs, miscellaneous notes, money orders, customer lists, and telephone address books. These records can reflect names, addresses and/or telephone numbers of associates and co-conspirators, the sale and purchase of controlled substances including precursors, customer lists, and amounts of money owed to the trafficker by customers and by the trafficker to his/her suppliers.

e.    Drug traffickers often travel domestically and internationally to facilitate their trafficking. Evidence of foreign and domestic travel by persons engaged in illegal drug trafficking includes travel itineraries, airline tickets, receipts, passports, and visas. These items are stored by drug dealers on their person or in their business, residences and surrounding garages, outbuildings, carports and yards, the residences of relatives and in cars. Many of these items are accessible via the internet and can be downloaded and saved on the computer or other digital media and on storage media.

f.    Drug traffickers often use storage facilities for drugs and other items related to trafficking that are at a location away from their residences and businesses. These off-site storage facilities are often commercial storage lockers and rooms. These locations are often used to store or hide drugs, contraband, money and other valuables. Drug traffickers often keep documents and other items tending to show the existence of other stored drugs, contraband, money and other valuables in areas such as storage facilities. Those documents and other items include rental agreements, receipts, keys, notes and maps specifically concerning off-site storage rooms, lockers, and safety deposit boxes. This

evidence may be found on their person or in their businesses, residences and surrounding garages, outbuildings, carports and yards, the residences of friends or relatives, and cars. This type of documentation can be stored on digital media and concealed virtually anywhere.

g.  Other evidence of transportation, ordering, possession and sale of drugs can include the following:  telephone bills to show numbers called by the drug dealers (and hence potential associates), overnight mail receipts, bank statements, deposit and withdrawal slips, savings books, investment statements, loan statements, other financial institution statements, and federal and state tax returns.  The above items are stored by drug dealers on their person or in their business, residences and surrounding garages, outbuildings, carports and yards, the residences of friends or relatives, and cars.  This type of documentation can be stored on digital media and concealed virtually anywhere.

h.  Drug traffickers usually sell their product for cash.  Because large quantities of drugs can sell for thousands of dollars at the wholesale level, dealers may have thousands of dollars in cash on hand both as proceeds of sales and to purchase supplies/inventory.  In addition, drug dealers often have other assets generated by their drug business, or purchased with cash earned, such as precious metals and stones, jewelry, real estate, vehicles, and other valuables.

i.  Individuals involved in drug dealing often try to legitimize these profits from the sale of drugs.  To accomplish this goal, drug traffickers may utilize foreign and/or domestic banking institutions and their attendant services, real estate and businesses, both real and fictitious.  They also try to secret, transfer and conceal the money by (a) placing assets in names other than their own to avoid detection while maintaining control, (b) laundering

money through what appears to be a legitimate business or businesses, (c) hiding the money in their homes, safes and safety deposit boxes, and/or (d) using the money to buy assets which are difficult to trace. This evidence is useful in a criminal prosecution, and it also is useful in identifying real and personal property that can be seized and forfeited by the government under existing laws. Documentation concerning this type of activity can be stored on digital media and concealed virtually anywhere.

j.   Evidence of significant, unexplained income of drug dealers, or for the acquisition and concealment of money and assets of drug sales, can be found on banking and investment account statements, credit card account statements, canceled checks, money orders, deposit slips, check and savings books, business and personal ledgers, accounting records, safe deposit box records and keys, federal and state tax records, rental receipts, rental agreements, utility bills, overnight mail receipts, telephone bills, loan statements records reflecting ownership of real or personal property (such as deeds of trust or vehicle registration, insurance, and ownership information), vehicle and property rental records, lease and purchase agreements, and canceled mail. These records can be maintained on paper, but also can be maintained as electronic data on computers and other digital media. The above items are typically kept by drug dealers on their person or in their businesses, residences and surrounding garages, outbuildings, carports, and yards, the residences of friends or relatives, and vehicles.

k.   The use of digital media, including smartphones, tablets, cellular phones, and digital devices, has become part of everyday life. This is also true for drug traffickers. Information stored in electronic form on all of the above-described devices can provide evidence of drug trafficking. Drug traffickers frequently use some or all of these devices

to communicate with co-conspirators, customers, sources of supply, and others involved in the drug trade. These communications include, but are not limited to, phone calls, text messages, SMS (Short Message Service) messaging, MMS (Multimedia Messaging Service) messaging, social media posts and messaging, and smartphone application messaging services. Smartphones, tablets, cellular phones, and digital devices are frequently capable of storing messages, emails, social media communications, and communications made over smartphone applications. The content of these communications will often provide evidence of drug trafficking. Numbers stored on a telephone (such as Caller ID lists reflecting recently received calls, speed dial lists of names and/or telephone numbers, and logs of outgoing and incoming calls) can provide evidence of who the drug dealer is calling, and thus the identity of potential associates.

l.   Drug traffickers often take, or cause to be taken, photographs and/or videos of themselves, their associates, their property and their drugs.  They usually maintain these photographs and/or videos on their person or in their businesses, residences or cars, on computers, or in the residences of friends or relatives.  Smartphones, tablets, cellular phones, digital cameras, and other digital devices often have the capability to take still photos and videos and save them indefinitely on the device's storage medium. Drug traffickers frequently use these devices to take their photographs and videos.

m.  Drug traffickers often maintain firearms, including rifles, shotguns, and handguns, and ammunition on their person or in their homes, businesses, or cars to protect themselves and their drugs and their drug profits.  They also may maintain indicia of firearms such as receipts for firearms and ammunition, boxes for firearms and ammunition, firearms

cleaning supplies, and instruction manuals and other documentation for firearms and ammunition.

n.  Drug traffickers often conceal evidence of drug dealing in vehicles outside of their residences for ready access and to prevent detection and seizure by officers executing search warrants at their residences.  This evidence, which is discussed in detail in the preceding paragraphs, includes controlled substances, indicia such as packing documents and electronic storage devices (and their contents,) evidence tending to show the distribution of drugs (such as IOUs, pay-owe sheets, ledgers, lists of names and numbers, telephone address books, etc.), digital devices such as cellular/mobile/smart telephones and tablets (and their contents), and counter-surveillance devices.

o.  Drug traffickers often utilize digital video surveillance systems. A digital video surveillance system is a surveillance system that is capable of capturing images, videos, and audio that can be compressed, stored or sent over communication networks. I know that it is common for digital surveillance systems to contain storage media that allow for 30 days or more of camera footage to be stored on the system. Digital video surveillance systems can be used for nearly any environment, including a commercial business or residence. I know that drug traffickers make use of video surveillance systems to monitor who is approaching their residence and assess whether the person presents a threat to the trafficker's drugs or drug proceeds. Drug traffickers also utilize surveillance equipment to obtain advance notice when law enforcement arrives to hide or destroy evidence of criminal activity. However, given the constant recording that occurs with a digital surveillance system, it is also common that the digital video surveillance system will also

depict evidence of the residents' drug trafficking activities and conversations related to drug trafficking.

p.  Documents showing who owns, occupies, or controls the location being searched also show who is responsible for the items found on the Subject Premises, including contraband and other evidence seized. Documents and items showing the identity of the persons owning, residing in or controlling the area being searched include, but are not limited to, utility and telephone bills, canceled envelopes and correspondence, outgoing answering machine messages, tax returns, keys, deeds and mortgage receipts. These documents may also be produced on computers, downloaded from online accounts or scanned into digital format and stored on computers and related digital media.

9.  The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, smartphones, tablets, server computers, and network hardware. The term "digital media" includes personal digital assistants (PDAs), smartphones, tablets, BlackBerry devices, iPhones, iPods, iPads, digital cameras, and cellular telephones. The term "storage media" includes any physical object upon which electronic data can be recorded, such as hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media or digital medium. Collectively, the terms "computer," "digital media," and "storage media" are referred to as "electronic media."

10.  A list of items agents seek authority to seize is in Attachment B.

## ELECTRONIC MEDIA AND FORENSIC ANALYSIS

11.    As described above and in Attachment B, this application seeks permission to search for evidence and records that might be found on the Subject Premises, in whatever form they are found.  Much of the evidence and records described in the paragraphs above, and in Attachment B, can also be produced and/or stored on electronic media.  For this reason, I submit that if a computer, digital medium, or storage medium is found on the Subject Premises, there is probable cause to believe those records will be stored on that computer, digital medium, or storage medium. Thus, the warrants applied for would authorize the seizure of electronic media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

12.    Necessity of seizing or copying entire electronic media:  In most cases, a thorough search of a Subject Premises for information that might be stored on electronic media often requires the seizure of the physical electronic media and later off-site review consistent with the warrants. In lieu of removing electronic media from the Subject Premises, it is sometimes possible to make an image copy of electronic media.  Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files.  Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the electronic media, and to prevent the loss of the data either from accidental or intentional destruction.  This is true because of the following:

    a.    The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site.  Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on Subject Premises could be unreasonable.

Electronic media can store a large volume of information. Reviewing that information for things described in the warrants can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b. Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Subject Premises. However, taking the electronic media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c. Variety of forms of electronic media. Records sought under these warrants could be stored in a variety of electronic media formats that may require off-site reviewing with specialized forensic tools.

d. Nature of examination. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrants I am applying for would permit seizing, imaging, or otherwise copying electronic media that reasonably appear to contain some or all of the evidence described in the warrants and would authorize a later review of the media or information consistent with the warrants. The later review may require techniques, including but not limited to computer-assisted scans of the computer or entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrants.

13.   The warrants I am applying for would permit law enforcement to obtain from certain
individuals the display of physical biometric characteristics (such as fingerprint, thumbprint, or
facial characteristics) in order to unlock devices subject to search and seizure pursuant to the
requested warrants.  I seek this authority based on the following:

a.   I know from my training and experience, as well as from information found in publicly
available materials published by device manufacturers, that many electronic devices,
particularly newer mobile devices and laptops, offer their users the ability to unlock the
device through biometric features in lieu of a numeric or alphanumeric passcode or
password. These biometric features include fingerprint scanners and facial recognition
features. Some devices offer a combination of these biometric features, and the user of
such devices can select which features they would like to utilize.

b.   If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock
the device through his or her fingerprints. For example, Apple offers a feature called
"Touch ID," which allows a user to register up to five fingerprints that can unlock a
device. Once a fingerprint is registered, a user can unlock the device by pressing the
relevant finger to the device's Touch ID sensor, which is found in the round button
(often referred to as the "home" button) located at the bottom center of the front of the
device. The fingerprint sensors found on devices produced by other manufacturers have
different names but operate similarly to Touch ID.

c.   If a device is equipped with a facial recognition feature, a user may enable the ability to
unlock the device through his or her face. For example, Apple offers a facial recognition
feature called "Face ID." During the Face ID registration process, the user holds the
device in front of his or her face. The device's camera then analyzes and records data

based on the user's facial characteristics. The device can then be unlocked if the camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Face ID.

d.    In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

e.    As discussed in this affidavit, based on my training and experience I believe that one or more digital devices will be found during the search. The passcode or password that would unlock the device(s) subject to search under the requested warrants are not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the device(s), making the use of biometric features necessary to the execution of the search authorized by the requested warrants.

f.    I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when: (1) more than 48 hours has elapsed since the device was last

unlocked; or (2) when the device has not been unlocked using a fingerprint for four hours and the passcode or password has not been entered in the last 156 hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

g.    In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose physical characteristics are among those that will unlock the device via biometric features, and it is also possible that the person in whose possession the device is found is not actually a user of that device at all. Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a Subject Premises without any identifying information on the exterior of the device. Thus, it will likely be necessary for law enforcement to have the ability to require any individual who is found at the Subject Premises and reasonably believed by law enforcement to be a user of the device, to unlock the device using biometric features in the same manner as discussed above.

h.    Due to the foregoing, if law enforcement personnel encounter a device that is subject to search and seizure pursuant to the requested warrants and may be unlocked using one of the aforementioned biometric features, the warrants I am applying for would permit law enforcement personnel to: (1) press or swipe the fingers (including thumbs) of any

individual, who is found at the Subject Premises and reasonably believed by law enforcement to be a user of the device, to the fingerprint scanner of the device; and (2) hold the device in front of the face of those same individuals and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search its contents as authorized by the requested warrants.

## PROBABLE CAUSE

14.    DEA and HSI Special Agents and other law enforcement officers (collectively, "agents") are currently investigating a Drug Trafficking Organization (DTO) which operates in New Mexico, Texas, and elsewhere that distributes methamphetamine, cocaine, and fentanyl.

15.    Beginning in March 2024, and ending in October 2024, the Honorable United States District Judge Kenneth J. Gonzales signed five separate orders in the District of New Mexico authorizing the interception of wire and electronic communications for a total of 13 telephones, being utilized by eight different members of the DTO. Based on the intercepted communications, agents confirmed that Gonzales distributes methamphetamine, cocaine, and fentanyl, that B. Gonzalez distributes methamphetamine, and that Herrera distributes fentanyl pills and methamphetamine in Las Cruces, New Mexico.

16.    On October 16, 2024, a Grand Jury from the District of New Mexico indicted Gonzales, B. Gonzalez, Flores, Beserra, Herrera, Valles, Parra, and five others in a 92-count Indictment charging numerous drug-trafficking crimes, including conspiracy to distribute controlled substances. Based on the Grand Jury indictment, Gonzales, B. Gonzalez, Flores, Beserra, Herrera, Valles, Parra, and the others have outstanding warrants for their arrests.

A.      Subject Premises 1 – 5301 Bell Road SW, Las Cruces, New Mexico 88012

17.      Over the course of the investigation, agents have identified Subject Premises 1 as the residence

of Gonzales. According to the New Mexico Department of Motor Vehicles ("DMV"), Gonzales

has an address of 5301 Bell Road SW, Las Cruces, New Mexico (Subject Premises 1).

Furthermore, agents have been monitoring a stationary surveillance camera that was placed

outside Subject Premises 1 and have observed Gonzales come and go from the residence

frequently, indicating that he lives at Subject Premises 1. During surveillance, agents have seen

Gonzales at Subject Premises 1 as recently as October 23, 2024.

18.      Based on surveillance, recorded conversation, and confidential sources, I believe that Gonzales

distributes methamphetamine and fentanyl from Subject Premises 1 and elsewhere.

19.      On July 8, 2024, at approximately 11:59 p.m., Anthony Lopez ("Lopez"), using phone number

575-499-0074, called Gonzales.  During the call, Lopez stated, "Uhm, I was going to tell you.

I was going to see if you were going to be out and about tonight, if you could swing by [U/I]s,

dawg. I got five…I think five, almost six already."  Gonzales said that he would go by in a

little bit, and Lopez stated, "I got, I got people waiting on water, now."  Gonzales confirmed

that Lopez needed "water," and Lopez stated, "Alright, no, no, no let me get more…let me get

half and half.  [U/I] I'm gonna get 15 more of, more of blueberries and the…onions."

Gonzales said that he would be there in a little while.  Based on my training, experience, and

knowledge of this investigation, I believe that Lopez was asking Gonzales to sell Lopez

methamphetamine and fentanyl.  I believe that Lopez was saying that he had almost $600 to

pay for the methamphetamine and fentanyl, and that he had customers waiting to purchase the

methamphetamine from Lopez.  I further believe that Gonzales agreed to sell the

methamphetamine and fentanyl to Lopez.

20.     Beginning approximately one-half hour later, between 12:24 a.m. and 1:16 a.m. on July 9,

2024, Gonzales and Lopez exchanged text messages in which Lopez stated, "Lets do an onion

and whatever rest you can do in berries, brother.  I got the 6 on me."  Lopez added, "Lmk fam I

got people waiting on both rn."  Gonzales responded, "Ok we kool stop bye."  Based on my

training, experience, and knowledge of this investigation, I believe that Lopez was clarifying to

Gonzales that Lopez wanted to purchase an ounce of methamphetamine and an unknown

quantity of fentanyl pills.  I also believe that Lopez was indicating that Lopez had $600 to pay

Gonzales for the methamphetamine and fentanyl pills and that Gonzales agreed to provide the

methamphetamine and fentanyl to Lopez.

21.     On July 14, 2024, at approximately 5:34 p.m., Gonzales received a call from Alfonso Alarcon

("Alarcon"), using telephone number 575-405-0685.   During that call, Alarcon told Gonzales

that Alarcon needed "all three."  Later in call, Alarcon told Gonzales that it was a couple

hundred, probably three to four hundred.  Immediately thereafter, at approximately 5:34 p.m.,

Gonzales received a text from Alarcon.  That text stated "150 fet, 150 ills, 120 water."  Based

on my training, experience, and knowledge of this investigation, I believe that Gonzales and

Alarcon were speaking about 150 dollars' worth of fentanyl powder, 150 dollars' worth of

fentanyl pills and 120 dollars' worth of methamphetamine.

22.     That same day, on July 14, 2024, agents intercepted multiple conversations between Gonzales

and other co-conspirators regarding the distribution of fentanyl. At approximately 10:37 p.m.,

agents intercepted a phone call between Gonzales and Gabriel Soltero ("Soltero"), who was

using phone number 575-993-7321. During the phone call, Gonzales told Soltero that he was at

his mom's house (Subject Premises 2). Soltero then asked Gonzales if he wanted Soltero to go

Subject Premises 2, because Soltero had money for Gonzales. Soltero also stated he was

looking to get some more. Gonzales told Soltero that he was getting ready to leave Subject Premises 2. Soltero again stated that he needed to get some more from Gonzales. Gonzales then told Soltero that he would be at his house (Subject Premises 1) in about 30 minutes. I believe, based on my training and experience with this DTO, that Soltero was attempting to give Gonzales money to purchase drugs from Gonzales. Also, I believe that when Soltero told Gonzales that he needed to get some, he was referring to getting drugs from Gonzales. I also believe, based on this conversation, that Gonzales was arranging to give Soltero drugs at Subject Premises 1.

23.     On the same day, at approximately 11:38 p.m. on July 14, 2024, agents intercepted another phone call between Soltero and Gonzales. During the phone call, Gonzales told Soltero that he was home (Subject Premises 1).

24.     Approximately eight minutes later, at 11:46 p.m., agents intercepted a text message from Cash App, an electronic banking system that allows peer to peer money transactions through an application on a smartphone. The text message read, "Cash App: Gabe Soltero sent you $40. Open the app for more details." Based on the intercepted conversations on July 14, 2024, I believe that Gonzales provided drugs to Soltero at Subject Premises 1 and that Soltero paid for the drugs using Cash App.

25.     On July 16, 2024, at approximately 5:58 p.m., agents intercepted conversations between Gonzales and Bernie Diaz ("Diaz"), who was using telephone number 575-636-8610. During the phone call, Gonzales told Diaz that Gonzales was heading to his house (Subject Premises 1). Diaz then said he was heading to Gonzales. Gonzales asked if Diaz wanted a whole or a half. Diaz asked for three quarters. Gonzales agreed and said he would talk to Diaz when he

got there.  Based on my training and experience, I believe that Gonzales agreed to provide Diaz methamphetamine at Subject Premises 1.

26.    Also, on July 16, 2024, at approximately 6:10 p.m., agents intercepted a phone call between Soltero and Gonzales. During the phone call, Soltero indicated that he was going to bring Gonzales a gallon of diesel fuel to Subject Premises 1.

27.    On the same day, agents conducted surveillance at Subject Premises 1. Agents observed Gonzales's Nissan Titan, a silver Cadillac, and a white pick-up truck parked in front Subject Premises 1.  At approximately 6:50 p.m., agents observed a green Ford Expedition arrive at Subject Premises 1.

28.    At approximately 7:31 p.m., agents observed the Ford drive away from Subject Premises 1. Agents identified the driver as Gabriel Soltero. Agents coordinated with local law enforcement to stop the vehicle. When agents initiated the traffic stop, the Ford fled from law enforcement. Soltero was not apprehended.

29.    At approximately 8:05 p.m., agents intercepted a phone call between Alarcon and Gonzales, regarding the distribution of drugs. During the phone call, Gonzales told Alarcon that he was at the pad (Subject Premises 1). Alarcon referenced receiving drugs from Gonzales. Gonzales asked Alarcon what he was needing. Alarcon told Gonzales that he had 100 ($100) and that he had money on Cash App. Gonzales asked Alarcon for food stamps so Gonzales could buy soda and water.

30.    On the same day, at approximately 10:02 p.m., agents intercepted a text message from Cash App. The text message read, "Cash App: alfonso Alarcon sent you $40. Open the app for more details."  Based on my training, experience, and knowledge of this investigation, I believe that Gonzales provided drugs to Alarcon and Alarcon paid Gonzales using Cash App

31.     On September 4, 2024, at approximately 9:40 p.m., Gonzales received a call from an Unknown Male (UM). During the call, the UM asked Gonzales if he had any "windows," and Gonzales replied in the affirmative. Gonzales then told the UM that the "windows does not have as much," and the UM replied that whatever Gonzales had. The UM then told Gonzales that he had $100 and told Gonzales to meet him at the 99 cents store. Gonzales said all right. Based on my training, experience, and knowledge of this investigation, I believe that when the UM was asking Gonzales for "windows" that he was referring to methamphetamine, and that Gonzales agreed to supply the UM with methamphetamine.

32.     On September 8, 2024, at 7:50 a.m., Gonzales received a text from an UM. In that text, the UM stated "Hey brother I don't know if you were up yet but you said you were going to leave me a 50 pack but then you fell asleep if you could put it in the glove box and the Cadillac CTS and let me know before you leave that would be awesome cuz I'm coming out there to work on that car today." A little while later, at approximately 7:55 a.m., Gonzales sent a text to the UM saying "It's in there." Based on my training, experience, and knowledge of this investigation, I believe that Gonzales left a package of 50 fentanyl pills for the UM.

33.     I believe, based on the intercepted communications and surveillance that Gonzales was distributing drugs from Subject Premises 1 and elsewhere.

34.     Based on the above information, there is probable cause to believe that evidence of violations of 21 U.S.C. §§ 841 and 846 are located at Subject Premises 1. Furthermore, I believe that Gonzales is residing at Subject Premises 1, therefore, the requested warrant will also assist in the apprehension of Gonzales.

B.    Subject Premises 2- 3115 El Camino Real, Space 82, Las Cruces, New Mexico 88007

35.    During the month of July 2024, through intercepted communications and law enforcement

databases, agents identified Gonzales's mother to be Elizabeth Gonzales ("E. Gonzales").

According to the New Mexico Department of Motor Vehicles ("DMV"), E. Gonzales has an

address of 3115 El Camino Real, Spc. 82, Las Cruces, New Mexico 88007 (Subject Premises

2).  On July 18, 2024, agents conducted surveillance at Subject Premises 2 and observed a red

Ford Fusion outside of Subject Premises 2, bearing New Mexico registration. According to the

New Mexico DMV, the vehicle is registered E. Gonzales at Subject Premises 2.

36.    On July 13, 2024, agents intercepted communications from an unidentified female subject

("UF"), utilizing telephone number 575-621-6780. During the phone call, I believe the UF and

Gonzales coordinated a drug transaction. The UF told Gonzales that she was looking for

vitamins from Gonzales. Gonzales asked the UF if she was close to Gonzales's mother's house,

which he described as by the St. Johns Trailer Park, which is consistent with the location of

Subject Premises 2. The UF said yes. Gonzales then stated that he would be there soon,

indicating that he was going to meet the UF at Subject Premises 2.  Also, during the

conversation, the UF confirmed she had $700 to give to Gonzales. Based on my training and

experience, I believe when the UF told Gonzales she was looking for vitamins, she was asking

for drugs. Also, I believe, based on the conversation, that Gonzales was not at Subject Premises

2 during the phone call, but that he was going to travel to Subject Premises 2 to conduct the

drug transaction with the UF.

37.    On July 17, 2024, agents intercepted communications between Gonzales and E. Gonzales.

During the phone call, E. Gonzales and Gonzales talked about the debt that "Chris" (believed

to be Gonzales's brother, Chris Gonzales) owed Gonzales. Gonzales told E. Gonzales that

Chris owed Gonzales $1,800. E. Gonzales told Gonzales that Gonzales needed to quit giving

Chris that stuff. E. Gonzales then asked Gonzales if Chris is smoking all of it. Gonzales said

that Chris was not. Gonzales went on and told E. Gonzales that Gonzales gave Chris "eight"

and there is only $400 to show for eight full ones. E. Gonzales then asked how much it would

have been for all eight. Gonzales then said that Chris can sell one for 200 ($200). I believe,

based on my training and experience, that E. Gonzales and Gonzales were talking about the

drug debt that Chris owed Gonzales. I believe when Gonzales said he gave Chris eight of them,

he was referring to having given Chris eight ounces of methamphetamine. DMV records show

that Gonzales' brother, Chris Gonzales, has a listed address at Subject Premises 2.

38.    On July 17, 2024, agents intercepted a conversation between Gonzales and Alarcon. During the

phone call, Gonzales and Alarcon discussed a drug transaction. Alarcon told Gonzales that he

had 250 ($250) and the 100 ($100) that he owed Gonzales. Gonzales then asked Alarcon what

the money was for.  Alarcon responded with "pastis" and the "other one" if Gonzales had them.

Gonzales then asked if Alarcon knew where Gonzales's mom's house was. Alarcon

acknowledged that he did and described the location of Subject Premises 2. Alarcon then stated

that he would be right there.  Based on my training, experience, and knowledge of this

investigation, I believe that when Alarcon said he wanted the "pastis," he was looking to

purchase fentanyl pills ("pastillas" is the word for "pills" in Spanish). I also believe when he

said and the "other one," he was referencing another controlled substance, likely

methamphetamine. I also believe that Alarcon and Gonzales were going to meet at Subject

Premises 2 to conduct the drug transaction.

39.    On July 19, 2024, agents intercepted communications from Benjamin Ramirez ("Ramirez")

and Anaya Goforth ("Goforth") talking to Gonzales, pertaining to the distribution of a firearm.

During the phone calls and text messages, I believe that Gonzales had agreed to provide Ramirez a firearm. During a phone call between Goforth and Gonzales, Gonzales told Goforth that he had a "gauge" that Goforth and his "homie" (Ramirez) could use if they wanted to pick it up right away. Gonzales told Goforth that he was at his mom's house. In the conversations, Goforth and Ramirez indicated that they were going to travel Gonzales's residence (Subject Premises 1) to put Gonzales's dogs away. Agents were conducting surveillance at Subject Premises 1 and observed a grey Chevrolet Impala arrive at approximately 11:36 p.m.

40.    At approximately 11:47 p.m., agents intercepted another phone call between Goforth and Gonzales. Based on my training, experience, and knowledge of this investigation, I believe that during the phone call, Ramirez was present with Goforth. Gonzales told both subjects that he had a "gauge" and that it is at Gonzales's mom's house if they wanted to stroll by. I believe that Gonzales was referring to having a shotgun at Subject Premises 2.

41.    At approximately 11:56 p.m., agents observed the gray Chevrolet Impala leave Subject Premises 1. Agents followed the Impala to Subject Premises 2, where they observed it park outside of the residence. Agents then intercepted a text message from Goforth to Gonzales indicating that Goforth was there. Agents then observed two individuals, later identified as Goforth and Ramirez, walk to Subject Premises 2.

42.    At approximately 12:59 a.m., agents observed the gray Chevrolet Impala leave Subject Premises 2. Agents coordinated with local law enforcement, who conducted a traffic stop on the Impala. The driver was identified as Ramirez, and the passenger was identified as Goforth. As agents approached the vehicle, they observed a gun in the driver's side door panel. A search of the vehicle revealed the firearm was a Mossberg International .22 caliber firearm. There was also a loaded magazine containing .22 caliber bullets inside the same door panel containing the

firearm. Ramirez and Goforth are both convicted felons and are therefore prohibited from possessing a firearm. Ramirez was arrested for felon in possession of a firearm.

43.     Based on the above information, there is probable cause to believe that evidence of violations of 21 U.S.C. §§ 841 and 846 are located at Subject Premises 2.

C.     Subject Premises 3 – 5266 Ralls Road, Las Cruces, New Mexico 88012

44.     Over the course of the investigation, agents have identified Subject Premises 3 as the residence of B. Gonzalez. On June 12, 2024, after intercepting conversations in which Flores asked B. Gonzalez for "two" (two ounces of methamphetamine) and in which Flores said that he would go to B. Gonzalez' house, agents observed Flores' vehicle leave Flores' house and go to Subject Premises 3.  On June 23, 2024, after intercepting conversations between Flores and B. Gonzalez regarding a drug transaction, agents observed two vehicles which are used by B. Gonzalez to be at Subject Premises 3. On July 11, 2024, B. Gonzalez told an unknown female to pick her up and gave the address for Subject Premises 3.  During surveillance, agents have observed B. Gonzalez at Subject Premises 3 as recently as the first week in October 2024.

45.     Based on surveillance, intercepted communications, and statements to law enforcement from co-conspirators, I believe that B. Gonzalez distributes methamphetamine and fentanyl from Subject Premises 3 and elsewhere.

46.     On June 12, 2024, at approximately 2:58 p.m., Ernesto Flores ("Flores") called B. Gonzalez. During the call, Flores asked, "Mm… do you have, do you have two?"  B. Gonzalez responded, "Yes. You need me to go?"  The two then discussed whether Flores would go to B. Gonzalez or the other way around, and Flores said, "Do you want me to go there?  Because I, because I probably need more than that.  So about now they are two."  B. Gonzalez responded, "Okay, well… well, if you want to come, come.  We have here more of those" as Flores,

talking at the same time, stated, "I'm on my way, I'm heading over now. Alright." Based on my training, experience, and knowledge of this investigation, I believe that Flores was asking B. Gonzalez if B. Gonzalez had two ounces of methamphetamine available. I believe that B. Gonzalez was saying that she did have the methamphetamine available, and that Flores went on to say that Flores might need more than the two ounces of methamphetamine. I believe that B. Gonzalez was indicating that she had, or could get, additional methamphetamine if Flores needed more than the two ounces.

47.    At 6:55 p.m. that evening, Flores called B. Gonzalez again and asked if B. Gonzalez had another one. B. Gonzalez said yes. Flores asked if B. Gonzalez could deliver. B. Gonzalez said yes. B. Gonzalez said she would be right there. Flores then sent a text, asking "You still coming," and B. Gonzalez responded, "On my way" and "Pulling up." Based on my training, experience, and knowledge of this investigation, I believe that B. Gonzalez was agreeing to deliver an ounce of methamphetamine to Flores.

48.    On June 16, 2024, between 6:01 p.m. and 6:14 p.m., Flores called B. Gonzalez and asked if B. Gonzalez was at her house. B. Gonzalez said no. Flores said he needed one. B. Gonzalez asked if Flores was home. Flores said yes and asked if B. Gonzalez could bring it to Flores. B. Gonzalez said yes. B. Gonzalez called Flores back and asked if Flores was at his house. B. Gonzalez said that B. Gonzalez was going to take the kids home and then B. Gonzalez could go to Flores's, unless Flores wanted to go over there to B. Gonzalez's. B. Gonzalez said that Flores could just go to the house. Flores said he would do that instead, in 30 minutes. Based on my training, experience, and knowledge of this investigation, I believe that Flores was indicating that he needed one additional ounce of methamphetamine and that Flores was going to go to Subject Premises 3 to pick up the methamphetamine.

49.    On June 17, 2024, between 2:35 p.m. and 4:50 p.m., B. Gonzalez called and told Flores that the guy from work would be gone for a couple of days, so B. Gonzalez was wondering if Flores wanted to put in, get more, because they only had a few left.  Flores said that he only had $100, and he was trying to get another $100, because Flores was going to need another one.  B. Gonzalez said she could take one to Flores.  Flores asked if B. Gonzalez could bring Flores one.  B. Gonzalez said yes.  Flores said that he would figure out what to do by the time B. Gonzalez got there.  B. Gonzalez said okay.  Flores texted B. Gonzalez "Hey are you still coming there's some things I need to do."  B. Gonzalez responded via texted "Can u meet me at Super 8 on 70."  Flores texted "Yes" and "Now."  B. Gonzalez texted "K headed there now." Flores texted "Here."  B. Gonzalez texted "In back at pool."  B. Gonzalez then called and asked if Flores was there (Super 8) already.  Flores said yeah, on the other side.  Flores asked B. Gonzalez if by Highway 70.  B. Gonzalez said yes and told Flores to go to the back of the building and Flores would see the white truck.  Flores said he saw B. Gonzalez.  Beatriz said okay, bye.  Based on my training, experience, and knowledge of this investigation, I believe that B. Gonzalez delivered an ounce of methamphetamine to Flores.

50.    On June 18, 2024, at 2:30 p.m. Flores called B. Gonzalez and asked if Beatriz still had some. B. Gonzalez said yes. Flores asked how many B. Gonzalez had.  B. Gonzalez said plenty. Flores said that he would probably need another three or four.  B. Gonzalez said okay.  Flores said that Flores would go by and let B. Gonzalez know before he went.  At 4:23 p.m., B. Gonzalez called and asked if she was going or if Flores was coming over. Flores said he only had money for one, because the guys had not come by yet.  B. Gonzalez said okay. Flores asked if B. Gonzalez was going to bring it.  B. Gonzalez said yes, but they (B. Gonzalez and others) had to pay the water first.  Flores said okay. Based on my training, experience, and

knowledge of this investigation, I believe that B. Gonzalez was agreeing to sell several ounces of methamphetamine to Flores and that B. Gonzalez first told Flores to go to Subject Premises 3 to pick up the methamphetamine but then agreed to deliver the methamphetamine to Flores.

51.     On June 19, 2024, between 2:54 p.m. and 4:11 p.m., Flores sent a texted to B. Gonzalez "3 more," and B. Gonzalez responded via texted "K." Flores then texted "I sent you 30 on cash app I have the rest when are you coming." B. Gonzalez texted "Here." Between 7:04 p.m. and 8:10 p.m., Flores texted "Need another," and B. Gonzalez texted back "Okay." B. Gonzalez then called Flores, and Flores said they (he and others) would go over real quick and B. Gonzalez said okay. B. Gonzalez called Flores and asked if Flores was going to be home. Flores said he was almost at B. Gonzalez's house. B. Gonzalez asked Flores how many. Flores told B. Gonzalez to wait and said just one. Flores said he would be right there. Based on my training, experience, and knowledge of this investigation, I believe that Flores was arriving at Subject Premises 3 to pick up three ounces of methamphetamine from B. Gonzalez.

52.     On June 20, 2024, between 1:20 p.m. and 5:41 p.m., B. Gonzalez texted Flores, "Hey there u good?" Flores responded via texted "No need one." B. Gonzalez texted "Okay," and Flores texted back "Will you deliver." B. Gonzalez responded via texted "I think so," and then "Yes fixing to leave house now." B. Gonzalez then called Flores and said she would head over soon. B. Gonzalez said she was just waiting for some things that somebody was going to deliver to her. At the end of the call, B. Gonzalez said she was leaving then and heading over and the followed up with a texted "Omw." Based on my training, experience, and knowledge of this investigation, I believe that B. Gonzalez was at Subject Premises 3 and that she left from Subject Premises 3 to deliver three ounces of methamphetamine to Flores.

53.    On June 23, 2024, at approximately 1:49 p.m., agents intercepted text messages between Flores and B. Gonzalez.  At approximately 1:49 p.m., Flores texted, "2 more can you deliver." At approximately 2:02 p.m., B. Gonzalez responded, "Yes give me a few min." Beginning at approximately 3:05 p.m., agents intercepted text messages between Flores and B. Gonzalez in which Flores said, "R u on your way."  B. Gonzalez answered, "No he acting up but if u wanna come I'll be here."

54.    At 3:30 p.m., following B. Gonzalez's text message to Flores, Flores called B. Gonzalez. During the phone call, B. Gonzalez asked if Flores could go by. Flores told B. Gonzalez that he, and others, would be there in a little bit. Beginning at approximately 3:43 p.m., agents intercepted text messages between Flores and B. Gonzalez in which Flores stated, "Need 2 ½." B. Gonzales responded, "K."

55.    At approximately 3:47 p.m., agents established surveillance in the area of Subject Premises 3. Due to the location of Subject Premises 3, agents were not able to see the residence, but could observe traffic coming into the area.

56.    At approximately 4:01 p.m., agents observed a black Cadillac SUV, which matched the description of Flores' Cadillac, traveling in the area of and head towards Subject Premises 3. Agents also observed a Hispanic male, who matched the description of Flores, driving the Cadillac. At approximately 4:11 p.m., agents observed the same Cadillac SUV traveling away from the area of Subject Premises 3. Agents were then able to confirm the driver was Flores. Agents maintained constant surveillance of the Cadillac as it drove into Las Cruces, New Mexico.

57.    Agents coordinated with local law enforcement to have Flores stopped. Agents initiated a traffic stop of Flores' vehicle. Agents identified the driver as Flores. There was also a passenger

seated in the front passenger seat of the Cadillac. During a search of Flores' vehicle agents found 45.736 net grams of pure methamphetamine.

58.  During the traffic stop, Flores told agents that he had picked up the methamphetamine from a female named Beatriz at her residence. Additionally, Flores told agents that he did not know Beatriz's address, but he knew she resided on Ralls Road. Flores also stated that there was a black Suburban and a white Suburban in the driveway of the residence. Furthermore, Flores admitted that he picks up methamphetamine from Beatriz' house once or twice a week.

59.  Based on the above information, there is probable cause to believe that evidence of violations of 21 U.S.C. §§ 841 and 846 are located at Subject Premises 3. Furthermore, the requested warrant will assist in the arrest of B. Gonzalez.

        D.     <u>Subject Premises 4 - 2826 Ox Cart Court, Las Cruces, New Mexico 88007</u>

60.  During this investigation, multiple individuals who are a part of this DTO have lived at Subject Premises 4, and Daniel Herrera is currently living at Subject Premises 4.  On September 16, 2024, agents learned that Subject Premises 4 was storing a stolen electric scooter within the Subject Premises. Agents approached the residence and encountered Herrera at the residence. Herrera gave agents consent to retrieve the stolen scooter.  Furthermore, on October 17, 2024, agents conducted surveillance at Subject Premises 4 and observed Herrera's vehicle, a tan Cadillac, at Subject Premises 4.  Finally, in October 2024, agents encountered Herrera in Las Cruces, New Mexico, and Herrera told agents that he was still residing at Subject Premises 4. The investigation has shown that Herrera distributes fentanyl and methamphetamine from Subject Premises 4 and elsewhere.

61.  On May 15, 2024, at 2:14 p.m., Sylvia Parra ("Parra") called Herrera.  During the call, Parra asked, "Oh.  Can you come by here?  So I can pay you... your, your bill and can you leave

me… um…" When Herrera indicated that he was by Mayfield High School and was going to get on the highway from his location, Parra stated, "Oh… but I need 'em now, because this guy is gonna…wants to buy 150 of them…For three bucks." Herrera stated that Parra could meet him at the McDonalds, and Parra stated, "Give me 200 of them, I'm gonna give you 100, give 200, as soon as I swap out with these guys right now, when I give, I'll go, I'll pay you up front for these, so how much would it be for 200? 400 bucks?" When Herrera was confused as to what Parra meant by "swap out," Parra added, "Well, 'cause I can't get the money without getting the product, so I have to have product at hand," and then said, "'Cause I won't make a lot off of them anyways. I'm selling them to them at three, but just so I could get money, you know what I mean?" Based on my training, experience, and knowledge of this investigation, I believe that Parra was asking Herrera to supply Parra with 200 fentanyl pills because Parra had a customer who was going to purchase 150 of them from her for $3 a pill. I further believe that Parra was telling Herrera that Parra had $100 to give Herrera when she received the fentanyl pills from him and that she would give him the remaining $300 for the fentanyl pills after she sold them to her customer.

62.    On May 15, 2024, following the interception of the above call, agents conducted surveillance and observed Parra arrive at Subject Premises 4, which is where Herrera was located. Shortly thereafter, at approximately 3:20 p.m., agents conducted a traffic stop on a silver Nissan Altima driven by Parra and a male passenger after the vehicle left Subject Premises 4. During the traffic stop, agents spoke with Parra. Parra gave consent to search the vehicle. During a search, several clear bags containing a total of 187 fentanyl pills (21.0 net grams of fentanyl) were discovered inside a red wallet which also contained multiple cards with Parra's name on them and Parra's social security card. No other drugs were located inside the vehicle. Agents

conducted an interview of Parra, who stated that she was coming from her son-in-law's house and identified her son-in-law as Herrera. Parra denied any knowledge of the fentanyl that was found in her wallet.

63.    Shortly thereafter, on May 15, 2024, at 4:48 p.m. Parra called Herrera and asked where Herrera was at. Herrera said he was at the same place (Subject Premises 4). Parra told Herrera not to leave because Parra got pulled over as soon as she left there. Parra said they were watching. Parra said she was not out of that thing when they came out from the side.

64.    On May 18, 2024, at approximately 3:29 p.m., Herrera called Antonio Valles ("Valles"). During the call, Valles said, "When you're coming, call me when you are on your way. [U/I] I'll send you." Herrera responded "Ok" and asked if the price was still the same. Valles asked what the price had been, and Herrera stated, "No, well… Well, it used to be, was, the whole one for 1,000. And then last time it was twelve hundred." Valles said that the price would still be the same and that "it" was good. Valles added, "half, so you can check it out," and Herrera responded, "Okay, uh… Mm, I'm going to need [clears throat] one whole one." When Valles was non-committal, Herrera stated, Uh, let me just, just give me like half an hour or something like that. Let me just… I just fucking woke up. So, they are bug…" Herrera then said he was going to get up and would call Valles so that Herrera could go to Valles' location. Based on my training, experience, and knowledge of this investigation, I believe that Valles and Herrera were discussing where they were going to meet so that Valles could provide Herrera with fentanyl pills. I believe that Herrera was asking if the price would be the same as the it had been in a prior transaction, and that he was asking if it would be $1,000 or $1,200 for 1,000 fentanyl pills. I further believe that Valles was saying that it would be the same price but was saying that Valles would only be supplying Herrera with 500 fentanyl pills. I believe that

Herrera reiterated that Herrera needed 1,000 fentanyl pills and said that he would head toward Valles' location.

65.     Approximately 75 minutes later, at 4:45 p.m. on May 18, 2024, Herrera, called Valles. During the call, Herrera said that he was going to head toward Valles' location. Valles said that he had to go to Las Cruces, and the two eventually agreed to meet at the outlet mall off of I-10 between El Paso and Las Cruces.

66.     Following the interception of the above calls between Valles and Herrera, agents observed via the pole camera on Valles's residence that someone entered a white Audi that was parked at Valles's residence and left the residence. While agents were not able to see the person well enough to identify him, based on the investigation, I believe that the person who left in the Audi was Valles. A short time later, agents observed the Audi meet with Herrera's vehicle at the outlet mall. Agents could not see exactly what happened during the meeting, but, shortly after the meeting, Herrera got back on the Interstate, heading toward Las Cruces, NM. Just before the state line, agents stopped Herrera's vehicle for speeding. Monique Garcia, Herrera's wife/girlfriend, was the driver of the vehicle, and Herrera was the passenger. During the traffic stop, officers asked both Herrera and Garcia to exit the vehicle. When Herrera got out of the passenger seat, there were numerous fentanyl pills on the passenger seat. Herrera advised officers that he had additional fentanyl pills hidden on his person. Herrera was asked to remove the pills, and he removed several fentanyl pills from his buttock's region. Herrera also extracted additional pills he had hidden inside his tennis shoe. Agents also recovered additional fentanyl pills from a Twisted Tea can which was on the floorboard behind the rear passenger seat. The total weight of the seized fentanyl pills was 66.89 net grams (519 fentanyl pills).

67.    Agents interviewed Herrera, and Herrera admitted to having just picked up 500 fentanyl pills (which he described as "half a boat") from someone that he knew only as Tony (Valles) and that he had paid $2 a pill. Herrera stated that Tony is known as a supplier for fentanyl pills. Herrera further stated that he was supposed to provide half of the 500 pills to someone else after he returned to Las Cruces. Herrera and Garcia were released at the conclusion of the traffic stop.

68.    The following day, on May 19, 2024, between approximately 9:15 a.m. and 4:33 p.m., Parra and Herrera exchanged text messages in which Parra stated that she needed to "get with" Herrera urgently. Parra went on to say, "I can just get a few for now. I don't need the whole thing that I get and…" Based on my training, experience, and knowledge of this investigation, I believe that Parra was asking to meet with Herrera to obtain fentanyl pills from Herrera. I believe that when Herrera didn't answer Parra, that Parra was stating that she didn't need to get the same quantity of fentanyl pills that she regularly gets from Herrera and that she could just get a few fentanyl pills for the moment.

69.    Approximately an hour later, at 5:33 p.m. on May 19, 2023, Herrera called Parra. During the conversation, Parra asked to meet up with Herrera. Parra asked if Herrera was over there. Herrera said yes. Parra said hell no. Herrera explained he lost his keys and that he and others were on the side of the highway picking up Herrera's things. Herrera said Monique was bringing his spare so Herrera could go back to his truck. Parra asked Herrera if he has spare ones, of the others, then said hers. Herrera said yeah. Parra asked if it has to be up front or later. Herrera said it depended on how many Parra wanted. Parra asked how many Herrera could spare. Herrera and Parra clarified Parra wanted the skittles (fentanyl pills). Herrera told Parra he only had what he found on the side of the highway, and they were all dirty. Parra said

that was okay. Parra asked if it was going to be the end of that and asked what Parra was going to do. Herrera said no, he could still get them. Parra asked at the same or higher. Herrera said they would probably be at 2.50 until he could get a better deal. Parra said okay and told Herrera that she needed something right now as she was trying to do something. Herrera told Parra to just go over there. Parra said no. Herrera said he did not have his keys. Parra said she would only meet Herrera at his house, not anywhere else. Parra said she would talk to Herrera when they see each other. Herrera told Parra he and others were on the side of the highway acting like they broke down. Herrera told Parra that he and others were picking them up by the handfuls. Parra told Herrera that if she would have known she would have been there since the previous night. Herrera told Parra he knew exactly where he left them. Parra said she would have found them. Parra asked how many Herrera could spare right then, before Herrera got the big one. Herrera said he did not know and would have to see how many he had. Herrera said he was barely pulling them out of the dirt. Parra asked if Herrera could do at least 40 and Herrera said yeah. Parra told Herrera to aim for 50 and told Herrera she would call him back and to please answer the phone even if he was busy. Parra told Herrera she would need them in the next hour. Herrera said alright and said he was just waiting for Monique to bring his keys. Parra asked if Monique was already on the way. Herrera said yeah. Parra asked if Herrera would meet her as soon as Herrera had his keys. Herrera said yup. Herrera said he was going to look for his keys on the side of the highway after meeting Parra. Parra asked Herrera if he could meet at the storage. Herrera said yeah. Parra said the storage would be a better place. Parra asked Herrera to call when he was on the way. Herrera said okay.

70.  The GPS location information for Herrera's phone indicated that Herrera was at Subject Premises 4 during the time of the above-described call. Agents began surveillance of that

residence and saw Herrera's vehicle was at the residence. Agents observed as Herrera left the residence, and agents conducted a traffic stop on Herrera. Herrera was the driver and only occupant of the vehicle. Officers had Herrera exit the vehicle and noticed that his pants were unbuckled. Herrera gave consent for agents to search his vehicle. Agents asked Herrera if he had any pills. Herrera initially denied having any pills. However, when agents confronted Herrera and asked him how many pills he had in his anus, Herrera admitted that he had pills and removed them from his anus area. Herrera stated that there were approximately 150 pills. The pills appeared to have dirt on them. The pills later field tested positive for fentanyl. Lab results showed that there were 227 fentanyl pills with a net weight of 24.2 grams.

71.    Subsequent to the seizure, Herrera told agents that he was coming from Subject Premises 4. Herrera claimed to just be a user and stated that the pills seized from him were for his personal use. Herrera did not make any statements regarding from whom he had obtained the fentanyl pills but stated that he had purchased them for $2 a pill. Based on my training, experience, and knowledge of the investigation, I believe that Herrera had thrown fentanyl pills out the window of his vehicle during the traffic stop the previous evening and that he had gone back to the area where he had thrown them and recovered the pills.

72.    On June 7, 2024, at 3:30 p.m. Parra called Herrera. Parra told Herrera she was sorry but she did not have all the money yet but she would go across the street to see if Crystal had it yet. Parra said Chris was going to be there at noon and it was already 3:30 and he brought it to Parra. Parra told Herrera that was the one she could pay at that time and John would send it in a bit. Parra said Chris messed up the previous night. Herrera asked how much Chris owed Parra. Parra said 170 and that was because Parra already cut 60-70 dollars off and already paid Chris. Herrera asked Parra if it was off the 3 grams and Parra said it was. Parra said Chris was

going to sell them in increments of 20's because on 4 to 5, 36 and they were going to base it on for each grams of 4,6, and 8, 9, 10, and 12. Herrera asked what each dub is if it is .4. Parra said it is up to Chris. Parra said she asked Chris how he did them. Parra asked Herrera if it was done by .4 how many come out of a gram. Herrera said 2 and a half. Herrera said 5 could come out of 2 grams at .4. Parra said she did not know if Chris did them at .4. Parra said she still has people she can do .2. Parra said she asked Chris how much he could get out of a gram and how much he was going to sell it for. Parra said 4 times 3 is 12, and 12 times 20 is 240, then said 240 was a lot of money. Herrera said Yeah for a ball. Parra said put 50 bucks into 40 and it will total a ball. Parra said a lot of people did not know that, so that was why Parra was having Chris do it. Parra said Chris knows dumb and dumber, was down Picacho, and they would get it. Parra told Herrera she was just doing it that round and she was not going to do it the next round or the one after. Parra said she just needed to catch up real quick. Parra said Chris said he already had the money, but still asked Parra for more time, until Friday. Parra said she told him it was fine. Parra told Herrera Chris said his sister was going to send him some money. Herrera said he would go talk to Chris. Parra told Herrera not to. Herrera told Parra it was Chris' responsibility and Chris should not have been getting high on the supply. Parra said Chris would come through. Parra said she would go look for Chris. Herrera told Parra to tell Chris he was going to have to pay Parra double. Parra said she was going to go across the street to see if she could get the rest of the money to pay Herrera. Based on my training, experience, and knowledge of this investigation, I believe that Herrera was attempting to collect on a drug debt that Parra owed him and was telling Parra how someone could break down methamphetamine and sell it in smaller quantities to make money quickly.

73.    On June 18, 2024, at approximately 9:20 a.m., Gonzales called Leticia Rodriguez
("Rodriguez"). During the call, Rodriguez asked, "Okay. Did you get my text about what Fat,
Fat [Stammers] [U/I].." Gonzales responded, "Let's see the text right now. Say's uh, he will do
the pressure washer at 225. 60 [U/I] ." Rodriguez said yes and that "he just wants two. What
do you think?" When Gonzales seemed confused about the "two," Rodriguez stated "onions."
Gonzales then said, "Okay, let's… two onions?" Rodriguez said that if Gonzales wanted to
and said that Rodriguez gives "them" to "him" at "150." Gonzales stated "that'll work," and
Rodriguez stated, "Yeah, if you want to do that or you can do it, you can do it a different way.
You know what I mean. But yeah, I think that's a good deal, deal." Gonzales responded,
"yeah." Based on my training, experience, and knowledge of this investigation, I believe that
Rodriguez and Gonzales were discussing purchasing a stolen pressure washer from Herrera
(whose nickname is Fat Boy). I further believe that Rodriguez was saying that Herrera would
accept two ounces of methamphetamine as payment for the pressure washer, and that Gonzales
agreed to provide the methamphetamine to Herrera.

74.    On July 7, 2024, Rodriguez asked Armando Padilla ("Padilla") if anyone could hear
Rodriguez. Padilla said no and told Rodriguez that Padilla was alone. Rodriguez told Padilla
that Rodriguez was missing a bag. Rodriguez told Padilla that before they (Rodriguez and
Padilla) went, Rodriguez got in the shower and Rodriguez was making that (bag) for Fat Boy
(Herrera). Rodriguez asked Padilla where was the rest of it that were in the bag. Padilla told
Rodriguez that they were in Rodriguez's purse. Rodriguez told Padilla that Rodriguez only had
one. Rodriguez asked Padilla if Padilla did not grab anything. Based on my training,
experience, and knowledge of this investigation, I believe that Rodriguez was saying that she

had been making up a bag of narcotics to sell to Herrera and that she was now missing one of her bags of narcotics.

75.    Based on the above information, there is probable cause to believe that evidence of violations of 21 U.S.C. §§ 841 and 846 are located at Subject Premises 4. Furthermore, the requested warrant will assist in the arrest of Herrera.

E.    Subject Premises 5 - 1954 Lyon Place, Las Cruces, New Mexico 88001

76.    Since November 2023, agents have been investigating Richard Beserra ("Beserra") for drug trafficking in the Las Cruces, New Mexico area. In accordance with court orders, beginning in May 2024, agents intercepted telephonic communications from Beserra's telephone.

77.    Through the investigation, agents learned Beserra's brother, Roy Brock Beserra ("Brock") resides at Subject Premises 5. According to the New Mexico DMV, Subject Premises 5 is listed at Brock's residence on his New Mexico driver's license. Beserra also formerly lived at Subject Premises 5.

78.    According to Doña Ana County Property records, Kenneth Yeager is the owner of Subject Premises 5. Yeager purchased the property in 2006 and has owned it ever since. Based on the investigation, agents know that Yeager resides at Subject Premises 5, and agents have made contact with Yeager at Subject Premises 5 on multiple occasions.

79.    Beginning at 11:35 p.m. on May 25, 2024, Beserra sent two text messages with Brock in which Beserra said "We got took for 600 bucks walked away with no clear but we 300 pills." and "Do you need some I need some clear you can move these pills or whatecee." Beserra then placed a call to Brock. As the call began, Beserra was saying to someone in the background to sell them for two dollars a piece and for bulk, 900 bucks. Beserra then asked Brock if Brock read Beserra's text. Brock said that he had not because he was driving. Beserra told Brock to

read the text and call Beserra back.  Immediately thereafter, at 11:42 p.m., Beserra sent a text message to Jasper Acosta, which said, "Bro do have any one who wants to buy pills" and a text to "Brian" which said "Needs tic tags got them 3 a piece selling 100 packs."  Beserra also sent two text messages to Angelica Greene which said "Do your people want to buy some.tic tacs" and "We have some.at 3x100."  Beserra then sent a text message to Raymond Moore which said, "So. I came down to El past with vero to buy clear but all I ended up with was tic tacs 3/100 I need to flup them."  Based on my training, experience, and knowledge of this investigation, I believe that Beserra had traveled to El Paso to purchase methamphetamine but had instead ended up with 300 fentanyl pills that he was trying to sell to make money to return to El Paso to purchase methamphetamine.

80.    Beserra then called Brock at 11:23 p.m. on May 25, 2024, and told Brock that he had 200 pills and to let him know if Brock knew anyone who wanted them.  Brock asked how much Beserra was charging for them, and Beserra said "at least three a piece."  They continued talking about the price for pills and how to sell them.  At 5:56 p.m. on May 26, 2024, Brock Beserra sent $520 via CashApp to Beserra.  Based on my training, experience, and knowledge of this investigation, I believe that Beserra was offering to sell Brock 200 fentanyl pills for $3 each and that Brock sent Beserra $520 to purchase the fentanyl pills and/or to finance the methamphetamine purchase that Beserra wanted to make in El Paso.

81.    At 9:15 p.m. on May 26, 2024, Brock called Beserra, and another individual answered Beserra's phone.  The other individual said that they were on the way back and that they got what they needed.  Brock said that he was happy and would be waiting for them.  Based on my training, experience, and knowledge of this investigation, I believe that Beserra and the other

individual were on their way back to Las Cruces from El Paso with methamphetamine, and that Brock said that he was waiting for them so that he could get some of the methamphetamine.

82. On May 29, 2024, at 8:33 p.m., Beserra called another individual. During the conversation, Beserra told the other individual that he would meet the individual at "Brock's" house. The other individual asked Beserra how much he had, and Beserra responded, "Um, about 450, I think. Maybe 500," and the individual said that the individual needed to know exactly. Based on my training, experience, and knowledge of this investigation, I believe that the individual and Beserra were discussing how much money Beserra had to purchase an unknown type of narcotic. I believe that Beserra was telling the other individual that he had $450 to $500 to purchase the narcotics and that he was at Subject Premises 5.

83. On June 21, 2024, at approximately 9:59 p.m., agents intercepted communications between Beserra and Brock. During the communications, Beserra asked Brock if he knew what was going on in Brock's room. Brock responded, "no." Beserra then told Brock that Yeager and others were going through Brock's room. Beserra suggested to Brock for him to call Yeager.

84. On June 28, 2024, at 12:20 a.m., Beserra had a conversation with Audie Dickert. Dickert asked if Beserra had anything. Beserra said yes. Dickert asked where Beserra was at, and Beserra said that he at Brock's. Shortly thereafter, at 12:28 a.m., Beserra had a conversation with another individual. During the conversation, Beserra said that he got a ride up the hill, so the other individual did not have to worry about it. Beserra said that his ride also needed something so Beserra said that the ride could buy something from Beserra. The individual told Beserra not to leave with the individual's stuff. Beserra said that he was selling it to Audie. Beserra said that he would have Audie Cash App the other individual the rest of the money. The other individual said that the individual would be right back but was late meeting Tony and

needed the money from whatever Beserra sold to pay Tony 120 that was still owed. Based on my training, experience, and knowledge of this investigation, I believe that Beserra was at Subject Premises 5. I believe that the other individual was telling Beserra not to leave with the individual's drug supply and that Beserra was telling the individual that he was selling the drugs to Audie Dickert.

85.    On June 28, 2024, at approximately 12:10 p.m., agents intercepted additional conversations between Brock and Beserra. During the communications, Brock said that Beserra could "do it" from Brock's house so that Beserra could keep control of it. Brock added that Beserra should let Kenny know that Brock entrusted Beserra with that. Brock suggested that Beserra give Kenny some and added that Kenny would not make as much as Kenny would expect to make. Beserra asked Brock what happened with Monica's stuff. Brock told Beserra that he has been trying to make Kenny understand the numbers. Brock also told Kenny that Kenny knows the numbers but did not want to say them out loud. Brock stated that Kenny did not want to tell Brock how much they messed up, because Brock and Kenny messed up on the last bit.

86.    In the same phone call, Brock continued to explain that Kenny gave Kenny's girlfriend free pills, and that is why Brock did not trust Kenny. Brock stated that the only people Brock trusted were the people that did not use them (fentanyl pills). Brock went on to explain that "they" come in with $150 for 20 to 30 pills. Brock added that they sell themselves. Brock continued that one just sits there and lets them rest, take a shower, get out of the elements for a little bit, and to treat them like a normal human. Brock added that Brock had told this to Kenny. Based on my training and experience, I believe that Brock was suggesting that Beserra sell drugs out of Subject Premises 5 and that Beserra could tell Yeager that Brock trusted Beserra to sell narcotics from Subject Premises 5. I further believe that Brock was saying that

Yeager was aware that Brock and Monica were selling narcotics from Subject Premises 5 but that Yeager was not making as much money from the drug sales as he expected. I believe that Brock was saying that customers would go to Subject Premises 5 to purchase 20-30 fentanyl pills and that Brock had told Yeager to treat the customers better and to let them rest and shower at Subject Premises 5.

87.    On June 28, 2024, at approximately 7:39 p.m., Brock called Beserra.  During the conversation, Beserra told Brock that Beserra might be able to get "them" for Brock, and that "they" wanted $800 for a "boat."  Brock agreed to the $800 price and asked if "they" were going to take it to Brock's house.  Beserra responded that they would.  Brock told Beserra to make sure and count them and to let someone test it to make sure they are legit.  Brock said that people were making crappy pills now.   Based on my training, experience, and knowledge of this investigation, I believe that Brock agreed to purchase 1,000 fentanyl pills for $800 and that Beserra was going to have the sellers deliver the fentanyl pills to Subject Premises 5.

88.    On June 28, 2024, at approximately 8:52 p.m., Brock called Beserra. Brock asked Beserra about the 800. Beserra said it was there. Beserra then said that Beserra was doing Beserra's laundry and then Beserra would go over there. Brock then asked Beserra to send a picture when Beserra walked in the door. Beserra agreed. Brock then told Beserra that he was not going to send Beserra money until Brock was certain.

89.    In the same conversation, Brock told Beserra to go back to Brock's house. Brock requested Beserra to help the guys and get money from the ones that are at Brock's house. Brock then told Beserra that he could keep as much as he wanted. Brock then told Beserra to give Kenny 100 and for Beserra to tell Kenny it was from Brock for Kenny to sell. Beserra stated Beserra would not say anything to Kenny, because Beserra already gave Kenny some of the other ones.

Brock asked Beserra to give Kenny 50 from Brock's half for Kenny to sell and maintain. Beserra stated that Beserra would wait for Brock to get back. Brock said okay. Brock said that Beserra could just sit on it, Brock would take care of it. Brock told Beserra to not tell anyone about the deal. Beserra said no. Brock asked Beserra to tell Brock once Beserra arrived and Brock would send Beserra the money. Brock stated that Brock would sell every single [U/I] and asked how much money was left. Brock stated that if Brock sells all of the 1000 for $5 each it would be $5,000 dollars. Beserra said yeah, the turnaround is incredible. Brock told Beserra to make it happen and Beserra would be rewarded. Brock asked Beserra to let Brock know when the money was transferred. Beserra said Beserra will. Based on my training, experience, and knowledge of this investigation, I believe that Brock was asking Beserra to go back to Subject Premises 5 and give Yeager 100 fentanyl pills for Yeager to sell. I further believe that Beserra was saying that Beserra had already given Yeager some fentanyl pills to sell and that Brock then told Beserra to just give Yeager an additional 50 fentanyl pills to sell and to give Brock the remaining fentanyl pills. I believe that Brock was saying that if they sold the entire 1,000 fentanyl pills that they would make $5,000.

90.  Beginning at 10:50 a.m., on June 29, 2024, Beserra had a conversation with "Josh." Beserra asked Josh for $60-$70 because Beserra said that he was trying to get but that the people wanted to go back over the border and take everything with them if Beserra and others did not come up with the money. Josh said that he would see what he could do. Beserra said okay because "they" were trying to leave. Josh asked how much Beserra needed. Beserra said 70 but that anything would help. A few hours later, beginning at 2:21 p.m., Beserra reached back out and asked Josh what happened. Josh said that he was still trying to get the money.

91.     Based on the above conversations, agents believed that Beserra and another individual were in El Paso, TX, attempting to pick up narcotics. With the assistance of the GPS warrant for Beserra's phone, agents conducted lose surveillance on a vehicle being driven by the other individual, a tan Toyota Tacoma, while it was in El Paso. Because the driver appeared to be looking for surveillance units, the agents did not keep close enough surveillance of the vehicle to see if the occupants of the vehicle met with anyone in El Paso. Agents were able to locate the vehicle shortly after it arrived back in Las Cruces. At agents' request, at approximately 2:30 p.m., agents conducted a traffic stop on the vehicle as it left Subject Premises 5. During the traffic stop, agents conducted a search of the vehicle and seized 14.84 net grams of pure methamphetamine.

92.     On July 27, 2024, Officer's with the Las Cruces Police Department learned of an overdose death at Subject Premises 5. Agents responded to Subject Premises 5 and encountered Brock, Yeager, and a deceased overdose victim in the residence. Yeager admitted that he owned Subject Premises 5 and that both he and Brock lived at Subject Premises 5. On August 21, 2024, agents received a report for the Office of the Medical Investigator which confirmed that the death of the person who died at Subject Premises 5 was caused by toxic effects of fentanyl and methamphetamine.

93.     In mid-2024, a cooperating individual (CI) began providing information to agents regarding the DTO that is the subject of the current investigation. The CI's criminal history includes arrests and/or convictions for theft, assault, harassment, disorderly conduct, burglary, drug offenses, and violation of a restraining orders. Much of the information provided by the CI has been corroborated by other means, both by this investigation and by other investigations. When speaking with agents as a part of the CI cooperation, the CI has minimized the CI's drug

trafficking activity, especially in the beginning of the CI's cooperation, stating that the CI had only been involved in selling smaller quantities of methamphetamine than agents know the CI to have sold.  However, the CI did admit to selling methamphetamine, fentanyl, and firearms. The CI also appeared to be trying to protect someone close to the CI by denying that the person was involved in drug trafficking.  Based on their investigation, agents know that the person actually has been involved in drug trafficking, making the CI's statements regarding that person untrue.  Additionally, agents recently learned that despite the CI's cooperation with agents, the CI continues to be involved in the illegal sale of drugs.  Despite these issues, the CI has provided a significant amount of information that is relevant to this investigation and which agents have corroborated through other means.  Much of the information the CI provided regarding this investigation is known by agents to be true.  Therefore, I believe that the information provided by the CI and described below is accurate and reliable.

94.    During an initial debrief, the CI stated that Subject Premises 5 is a "trap house" that is used by Brock, Yeager, and others to distribute and consume drugs.  Based on my training, experience, and knowledge of this investigation, I know that "trap house" is a slang expression used by individuals involved with drugs to house to which drug users go to purchase and use drugs and that it is common to have significant numbers of drug users in such a house at any given time.

95.    On September 18, 2024, the CI informed agents stated that Ruben Galindo was back in Las Cruces, NM.  Agents know that Galindo is involved in drug trafficking, and Galindo was apprehended on July 31, 2024, in Silver City, NM, with approximately 100 grams of methamphetamine, several fentanyl pills, and two firearms.  Based on that incident, a federal criminal complaint has been signed charging Galindo with drug trafficking crimes, and there is an outstanding warrant for Galindo's arrest.

96.     The CI told agents that Galindo and Brock were selling drugs from Subject Premises 5. The CI added that Brock was working for Galindo. The CI explained that Yeager allows Galindo and Brock to distribute drugs from Subject Premises 5 because Yeager would receive free drugs from both Galindo and Brock.  Subsequent to learning the information regarding Galindo selling drugs from Subject Premises 5, agents conducted surveillance at Subject Premises 5. Agents observed a vehicle which agents have previously seen Galindo drive, and which is shown on the profile picture of Galindo's Cash App account, parked at Subject Premises 5.

## CONCLUSION

97.     I submit that this affidavit supports probable cause for warrants to search the Subject Premises described in Attachment A and seize the items described in Attachment B.

Respectfully submitted,
Chandler Rule
Special Agent
Drug Enforcement Administration

Electronically signed and telephonically sworn on
October _29_, 2024:

JERRY H. RITTER
UNITED STATES MAGISTRATE JUDGE

Page **47** of **47**